(*Circuit Court of Cook County. In Chancery.*)

### Albert F. Lunt

#### vs.

### Laura Marshall Lunt.

(May 20th, 1902.)

1. SERVICE BY PUBLICATION—EQUIVALENT TO PERSONAL SERVICE—
   WHETHER DEFENDANT IN DIVORCE PROCEEDINGS BOUND BY DECREE.
   Where the defendant in a divorce proceeding is served by pub-
   lication, and receives the notice of publication by mail, he has
   had his day in court, and is bound by the decree of the court.
2. DIVORCE—OBTAINED BY NON-RESIDENT—RIGHT OF DEFENDANT TO
   SET ASIDE BY BILL OF REVIEW WHERE COURT IMPOSED UPON.
   Where a person obtains a divorce and the court is made to
   believe that such person is a resident of Illinois the defendant
   is permitted on the ground of public interest to file a bill of
   review and have the decree vacated.
3. DOMICILE—WHAT CONSTITUTES—INTENT. The question of what
   constitutes the domicile of a person is largely a question of
   intention.

4. Same—Shown to Exist is Presumed to Continue. Where a particular domicile is shown to exist it is presumed to continue unless changed by clear and satisfactory evidence.

5. Same. Evidence reviewed as to whether party had changed her domicile.

Bill of review to review divorce proceedings. Heard before Judge Murray F. Tuley. The facts are stated in the opinion.

. *J. F. Richards*, for complainant.

*J. B. Brady*, for defendant.

Tuley, J. (orally) :—

This is a bill filed by Albert F. Lunt, complainant, against Laura Marshall Lunt, defendant. It is a bill of review, strictly speaking, and the only issue made by this bill is that of the residence of the present defendant (then complainant), at the time of the commencement of the divorce suit in which the decree was entered, which is sought to be reviewed. It is necessary under the statutes of this state, that every complainant in a divorce suit shall have resided within the limits of the state of Illinois for one year prior to the commencement of the suit. The divorce suit was commenced the last day of December, 1895. The evidence shows that publication was made as to the defendant in due form, that he received the notice of publication sent to him by the clerk; that he wrote to an attorney in this city concerning the suit; that he made no appearance, and that on the 11th day of March, 1896, default having been entered, evidence was heard and a decree of divorce pronounced upon the ground of desertion. He was telegraphed to, either the same day or the next day after the decree was entered, he, the husband, being then a resident of Boston, I believe.

Inasmuch as the notice was received by the defendant in that case (which under our statute was equivalent to personal service) he could have no standing in a court of equity to review the facts upon which the decree was granted. As to the facts of that case he may be said to have had his day in court, and if he had any defense to that, he had an opportunity to

make his defense. Not having made it, when he had an opportunity to do so, he is forever barred from making it thereafter, he is forever barred thereafter from setting up anything in opposition thereto. So that his counsel does not undertake in the bill of review filed, to contradict the facts upon which the decree of divorce was granted (desertion being the ground of divorce), he could not do it, because he was barred from making any such issue.

Not out of consideration for the defendant in the divorce suit; but out of consideration for the public interest, he is permitted by the law to come into court, and to show to the court, if he can, that a fraud has been practiced upon the court in regard to the right of the party to commence the suit, in regard to residence; that the court was imposed upon in being made to believe that the complainant in the divorce suit, the wife, had been a resident of the state of Illinois for one year prior to the filing of the bill for divorce. I say that is permitted to a defendant in a divorce suit upon the ground of public interest, for the public good; and in any case where the court is imposed upon as to jurisdiction, any party may come in and take advantage of it even although he benefits by so doing.

So that the only issue presented here is a question of fact as to the actual residence of the wife on the 31st day of December, 1895, the day the suit was commenced.

The complainant, the husband, has stated his story and she has told hers. They do not disagree as to one fact. It is evident from the testimony of both of them that this was a very unfortunate marriage, and it is to be deduced from the evidence I think of both the husband and the wife that the marital love between them scarcely survived the period of the honeymoon. Their story as to the main facts bearing upon the question at issue do not materially differ.

They were married in 1882. They lived unhappily—by inference from their own evidence and from the positive testimony of members of her mother's family,—until in 1888, when the husband took the wife to the East to visit his uncle. They went to Newburyport; the husband only remained a

few days,—was obliged to return to Chicago. The wife remained with his consent several weeks. When she came back, as I understand the evidence, she made some flying visits, probably to the East, I think in 1890. The evidence shows that she wished to return East to this uncle. The husband says he objected; the indifferent evidence of third parties shows that if he did object, it was on the ground of not having money to pay his wife's expenses. She went East with her aunt in 1892, and never returned to live with the defendant as man and wife from that day on.

The complainant's uncle, Captain Lunt, was an old man of some seventy-five years of age at that time, and quite wealthy, very liberal, and at that time was a hale and hearty man for his age. He was evidently pleased with Mrs. Lunt, it may be that he was somewhat infatuated with her, but that he loved her other than as a father would love a child, there is no reason to suppose for one moment, in fact the most creditable part of the complainant's testimony in this case was his declaration that he never suspected any improper conduct on the part of his wife with Captain Lunt.

In 1893 the complainant in this case, the husband, went on to Boston—I am mistaken about his wife going there in 1892, she had been there some three years at that time. In 1892 or 1893, he went to Boston, and went into business in the grain commission business,—opened up an office. His wife had induced his uncle to advance him $10,000 in cash, at least she swears she induced him to do so, and he swears that he don't know how his uncle came to do it, as I understand it.

Now, up to the time certainly, that she left Chicago for her uncle's in the East, her residence was the city of Chicago; that was her domicile.

The first question that arises is whether she went East with the intention of changing that domicile. There is no evidence to show that she went otherwise than on a visit. Her aunt, with whom she went at that time, stated that nothing was said about her return, and that she went merely on a visit.

The relations between this husband and wife, as stated,

were not at all pleasant; they were estranged from each other, and the sexual relation had ceased for some time.

The evidence tends to show that while they lived here in Chicago some several years after their marriage, he lived with her mother and paid little or nothing for the support of himself and wife; that he never gave the wife any money of any consequence, very little, if any. I think the evidence tends to show that it was not exceeding probably forty or fifty dollars, the whole time. He says though that he gave her money from time to time as his circumstances permitted; the amount he did not pretend to state. His circumstances did not permit him apparently to pay any board, and they may not have permitted him to give his wife even pocket money. They were at that time when the wife left Chicago, husband and wife only in name, had been so for some time.

If he had never gone to Boston and had remained here in Chicago, the question arises, what would have been her domicile, her place of residence? The evidence of her stepfather, her sister and her aunt, several members of the family, shows conclusively that not only then but ever afterwards she always claimed Chicago to be her home.

Her mother died, I think, in 1890 or 1892, leaving her an heir to a quarter interest in the homestead here in Chicago, which quarter interest she still retains. Now, as she went there upon a visit, what was her intention, as shown by her acts? She was in delicate health herself, her uncle became in bad health; they passed a good deal of the time on board of the yacht and in the South. She ministered to his wants. She had a home there in one sense, that is, she had her eating, her drinking, she got her clothes to wear, and it was the only place where she could sustain herself in her condition of health by her own exertions,—as she put it, she was earning her own living, because her husband did not support her.

What was she to do? Was she to come back here and make herself a charge upon her family, upon her stepfather and upon her mother while she lived? That is the question that confronted this woman when her uncle offered her a home

while he lived if she would take care of him—that was practically the arrangement. How could she do otherwise than accept? But did she in so accepting and consenting to attend to his wants while he lived, did she intend thereby to change her residence, her permanent residence from Chicago to Newburyport? If the complainant here, her husband, had never come on to Boston and gone into business in 1893, there could be in my mind no possible question. Now, did his coming on there make any change in her situation upon that question?

As I gather from the evidence, when he went on to Boston, their relations were as strained after that as they were before in Chicago; they were not husband and wife except in name. Did he take up any residence there? He says, and the evidence tends to show that he lived probably six or twelve months, maybe more, at his uncle's house in Newburyport. He paid no board, it cost him nothing, and he utters his complaint upon the witness stand here of the manner in which he was treated, that he was ignored. He says the only friend he had about the house was the pet dog. That may be true, but it tends to show the relations that existed between this man and wife, and as to whether he was in any sense providing a home for his wife. The uncle provided the home, he did not. And from the day she left Chicago, way back in 1890, the evidence fails to show that he ever said to his wife, ''Come home; come to me and live with me. Here is a home ready prepared for you; I am able to take care of you.''

Until his uncle's death, which was in 1896, the evidence rather tends to show that he was never able to provide her a home; he certainly never furnished one and tendered it to her. What was the wife to do at that time after he came on to Boston? He did not offer her a home, she had no other place to go except her uncle's where she was already. Could she do otherwise than as she did? Most assuredly not, in my opinion.

The case would present a different feature if when he went to Boston he had tendered her a home, had prepared a home, even had requested her to go and live with him in a home.

He was no more to her when he was in Boston, even when he was carrying on business in Boston and going home to Newburyport nights, he was no more to her, from the evidence, than any other visitor would have been to the house, and he, according to his own evidence, was neither more or less than a visitor—whether an enforced one or not is not material.

A wife may have a separate home from her husband when his conduct towards her justifies her in having one, in living separate and apart from him, but this question of domicile is, a question largely of intention. A domicile once shown to exist, as it is shown to exist in this case as to the wife, and to have been in Chicago, must be shown to have been changed by clear and satisfactory evidence. If there was a doubt— and there is really none in my mind but what this was her home, her domicile in the eye of the law up to the time that she filed her bill for divorce, and for some months afterwards —if there was any doubt upon the evidence, under the peculiar circumstances of the case, they must all be resolved in favor of the wife.

This complainant was asked on the stand by the attorney of the wife, "Have you now any regard for this woman?" His answer was, "I decline to answer." The court asked him, it having been developed that he had written her a letter in which he made a claim to an interest as tenant by curtesy to some property his uncle had left her (the uncle having died in 1896, and leaving him $75,000 and her an equal amount), he claimed an interest as tenant by curtesy under the law of Massachusetts. The court asked him here upon the stand whether he wanted a wife or wanted her property, and he said he would leave that to the court to judge. I must judge that he does not want this woman for his wife. It may be that the motive that influences him is a pecuniary one— to obtain some interest as a husband, by setting aside this decree of divorce; but the evidence tends to show also, that there is a very considerable degree of malice in this prosecution. The suit ought never to have been brought by the complainant.

The object is not to have the wife live with him. The wife has since remarried, apparently happily, married about a year after the divorce was granted, and the complainant knew this, knew of her intention to marry, but he made no objection. It is shown that at the time of his uncle's death, when his wife and himself were at the uncle's house, that the matter of her having obtained the divorce was spoken of, it had only been obtained then a few days, and that he expressed his satisfaction, and told his wife for her satisfaction that he was in love with another girl, mentioning her name, and where she lived, and that he was going down to Boston to buy her a set of diamonds and a ring, something to that effect.

He postponed commencing this suit to within a few days of the five years, a few days less than the limitation of five years limited for the bringing of the bill of review. He allowed the three years provided by a statute to lapse. He could have come in under the statute simply by making an appearance, and have had the decree re-opened, and he would be allowed to defend upon the merits; but he allowed the three years to expire, and he allowed the five years within a few days to expire.

The court has already directed the clerk to enter the judgment of this court. The finding of the court is that the equity of this cause is with the defendant, and that the complainant's suit be dismissed, with costs, for want of equity.